UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOSE INTERESTED UNDERWRITERS AT LLOYD'S, LONDON and THE WURTTEMBERGISCHE VERSICHERUNGS AG the subscribers to the contract of insurance numbered BB 040010/19<br><br>Plaintiffs,<br><br>-vs.-<br><br>MORVILLO AND SONS, INC.; and LEE'S MANUFACTURING CO. INC.,<br><br>Defendant | : | **COMPLAINT**<br><br>CA No:<br><br>CA 06 33T |

Plaintiffs, THOSE INTERESTED UNDERWRITERS AT LLOYD'S, LONDON and WURTTEMBERGISCHE VERSICHERUNGS AG the subscribers to the contract of insurance numbered BB 040010/19 (henceforth, collectively referred to herein as "Underwriters"), by their attorneys Carroll, Kelly & Murphy, complaining of the defendants, MORVILLO AND SONS, INC. and LEE'S MANUFACTURING CO., INC., allege as follows:

**THE PARTIES**

1. Underwriters are foreign insurers conducting business in London, England in the Lloyd's, London and London insurance company marketplaces. Underwriters are the insurers who subscribed to the contract/policy of insurance at issue in this matter (henceforth, the "Policy"; See Exhibit A) which is discussed in further detail herein.

2. Upon information and belief, defendant Morvillo and Sons, Inc. is, and at all times hereinafter mentioned was, a corporation organized under and by virtue of the laws of the State of Rhode Island, with a principal place of business at 160 Niantic

Avenue, Providence, Rhode Island 02907. Defendant Morvillo and Sons, Inc. is a named insured on the Policy.

3. Upon information and belief, defendant Lee's Manufacturing Co., Inc. is, and at all times hereinafter mentioned was, a corporation organized under and by virtue of the laws of the State of Rhode Island, with a principal place of business at 160 Niantic Avenue, Providence, Rhode Island 02907. Defendant Lee's Manufacturing Co., Inc. is a named insured on the Policy.

4. Upon information and belief, Defendants Morvillo and Sons, Inc. and Lee's Manufacturing Co., Inc. share common ownership and operate out of the same location.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction pursuant to 28 U.S.C. §1332.

6. Underwriters are citizens of England and Wales, Germany and other foreign nations and/or states of the United States other than the State of Rhode Island.

7. Defendants Morvillo and Sons, Inc. and Lee's Manufacturing Co., Inc. are Rhode Island Corporations with principle places of business within the State of Rhode Island.

8. The amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

9. This District is the proper venue pursuant to 28 U.S.C. §1391.

10. Defendants Morvillo and Sons, Inc. and Lee's Manufacturing Co., Inc. are residents of this District.

11. A substantial part of the events giving rise to this dispute occurred in this District.

12. Defendants Morvillo and Sons, Inc. and Lee's Manufacturing Co. Inc. are subject to personal jurisdiction in this District (henceforth, Morvillo and Sons, Inc. and Lee's Manufacturing Co., Inc. shall collectively be referred to at times as "Morvillo").

## INTRODUCTION

13. Morvillo has submitted an insurance claim (the "Claim") to Underwriters seeking indemnification for what it has alleged was a physical loss of insured property.

14. That claimed loss allegedly arose from a series of transactions between Morvillo and an entity named Bangles Around the World (henceforth, "B.A.W.") during the period of September 2004 through January 2005 (the "Claim Period").

15. In those transactions, Morvillo sold and delivered manufactured gold jewelry components to B.A.W. in exchange for promises to be paid for that gold. Each of the transactions involved the intentional – and, therefore, not fortuitous – delivery of manufactured gold jewelry components by Morvillo to B.A.W.

16. Upon completion of each of the relevant deliveries, all right, title and interest in the manufactured gold jewelry components passed from Morvillo to B.A.W. As such, Morvillo had no insurable interest and no insured interest in the manufactured gold jewelry components once the deliveries to B.A.W. were completed.

17. Upon information and belief, after completion of the deliveries of manufactured gold jewelry components to B.A.W., Morvillo would have had contractual rights to receive payments from B.A.W. in the form of gold (in any form) and/or money.

18. It has been alleged by Morvillo that B.A.W. paid Morvillo for some but not all of the manufactured gold jewelry components that it received from Morvillo. B.A.W. eventually encountered financial difficulties and ceased operations in or before May 2005.

19. It has been further alleged by Morvillo that when B.A.W. ceased operating it had an outstanding debt to Morvillo which B.A.W. did not satisfy. It is that debt which forms the entirety of the Claim.

20. Any outstanding debt or contractual obligations that B.A.W. may owe to Morvillo do not constitute insured property within the scope and terms of the Policy.

21. Underwriters conducted an investigation of the Claim after it was presented to them. Based upon that investigation, Underwriters do not believe that they owe any indemnification under the Policy to Morvillo. As such, Underwriters seek a declaratory judgment that (i) there is no coverage for the Claim under the Policy; and (ii) Underwriters have no further obligations of any kind to Morvillo with respect to the Claim.

**MORVILLO'S BUSINESS**

22. Morvillo is a fabricator of various types of precious metal components for jewelry, including manufactured gold jewelry components.

23. As part of its business Morvillo manufactures gold jewelry components that jewelry manufacturers use in the production of jewelry.

24. Based upon purchase orders from jewelry manufacturers, Morvillo mixes pure gold with certain alloys to arrive at a particular karat (or measure) of purity such as 10 karat, 14 karat, 18 karat, etc. Once the karat weight is achieved, Morvillo manipulates the gold into components such as sheets, strips, plates, or wire, depending upon the needs of a particular customer.

25. In connection with its business, at any given time Morvillo has at its fabrication facility large quantities of precious metals and manufactured jewelry

components containing precious metals. Gold in various levels of purity is one of the precious metals that Morvillo uses to make manufactured jewelry components.

**THE CONTRACT/POLICY OF INSURANCE**

26. In or about February 2005, Morvillo acted through its brokers and agents -- Basden Risk Management in Birmingham, Alabama (henceforth, BRM") and Dennis M. Clayton & Co. Ltd. in London, England (henceforth, "Clayton's) -- to enter into a contract of insurance in London, England, with Underwriters.

27. In connection with that transaction, representatives of Underwriters affixed their marks (referred to as "scratches") to a contract of insurance in the form of a document entitled "Declaration No: BB040010/19." A true copy of that Declaration (henceforth, the "Policy") is annexed hereto as Exhibit A.

28. Pursuant to the Policy, Underwriters agreed to provide insurance for the "Assured's Stock" against "All Risks of Physical Loss or Damage." (Exhibit A, p. 1).

29. The Policy is for a term beginning on February 1, 2005, and ending on February 1, 2006. (Exhibit A, p. 1).

30. Subject to its terms and conditions, the Policy provides Morvillo with $15 million of coverage for its stock at the Morvillo premises located at 160 Niantic Avenue, Providence, Rhode Island. (Exhibit A, p. 1).

31. Subject to its terms and conditions, the Policy also provides $150,000 of coverage for Morvillo's stock when it is located at the premises of a third party. This coverage is set forth in the language providing $150,000 of coverage "in respect of interest at third Parties..." (Exhibit A, p. 1).

32. Upon information and belief, broker Clayton's subsequently issued to Morvillo a document called "Certificate No. BB040010/19" (henceforth, the "Certificate") which advised Morvillo of the terms and conditions of the Policy.

33. Upon information and belief a copy of the Certificate was delivered to Morvillo in Rhode Island by either broker Clayton's or broker BRM.

34. Attached hereto as Exhibit B is a true copy of what Morvillo has represented to Underwriters was the Certificate that was delivered to it by its brokers.

**THE RELATIONSHIP BETWEEN MORVILLO AND B.A.W.**

35. Upon information and belief, until it ceased operating in or before May 2005, B.A.W. was in the business of manufacturing bangle bracelets and other types of finished jewelry, predominantly for wholesale distribution.

36. Upon information and belief, B.A.W. had numerous suppliers of manufactured gold jewelry components and other materials necessary for manufacturing the finished jewelry that it sold. Morvillo was one of those suppliers.

37. Upon information and belief, on or about June 14, 2001, B.A.W. submitted a credit application to Morvillo.

38. Upon information and belief, Morvillo contacted the trade references listed in B.A.W.'s credit application and ordered and/or reviewed a credit report of B.A.W. from the Jewelers Board of Trade.

39. Upon information and belief, in or about 2001, Morvillo decided to extend B.A.W. credit in connection with the sale of manufactured gold jewelry components.

40. Upon information and belief, in 2001 Morvillo began supplying B.A.W. with manufactured gold jewelry components for the manufacturing of jewelry.

41. Upon information and belief, at some point in 2002 and/or 2003, B.A.W. stopped sending purchase orders to Morvillo.

42. Upon information and belief, at the time B.A.W. stopped sending purchase orders to Morvillo, or shortly thereafter, B.A.W. had satisfied in full its obligations to pay Morvillo for the manufactured gold jewelry components that it had received up until that time.

43. Upon information and belief, in 2004 B.A.W. resumed its business with Morvillo.

44. Morvillo has represented that during the Claim Period it made numerous shipments of manufactured gold jewelry components to B.A.W.

45. The manufactured gold jewelry components that Morvillo "sold" to B.A.W. during the Claim Period consisted of 14 karat gold strips. (See Exhibit C, pp. 2-3, a transcript of a recorded statement provided by Morvillo's Comptroller to Underwriters in connection with the investigation of the Claim).

46. A copy of the transcript that is Exhibit C was provided to Morvillo during Underwriter's investigation of the Claim and no objection was made to its content or accuracy. As such, Underwriters were entitled to rely upon Exhibit C in evaluating the Claim.

47. In describing those transactions to Underwriters, Morvillo's representative explicitly stated that the property in question had been "sold" to B.A.W. (Exhibit C, p. 3).

48. Upon information and belief, each claimed shipment of manufactured gold jewelry components from Morvillo to B.A.W. during the Claim Period was in response to a purchase order received by Morvillo from B.A.W.

49. None of the transactional documents during the Claim Period reserved to Morvillo any right, title or interest in the manufactured gold jewelry components that Morvillo delivered to B.A.W. during the Claim Period.

50. Morvillo never filed any Uniform Commercial Code statements and made no efforts to perfect a security interest for any of the manufactured gold jewelry components delivered to B.A.W. during the Claim Period. (Exhibit C, p. 5).

51. Morvillo knew that the manufactured gold jewelry components that it delivered to B.A.W. during the Claim Period would be used by B.A.W. for the manufacturing of jewelry. (Exhibit C, p. 3).

52. Morvillo also knew that the gold jewelry that was made by B.A.W. using the manufactured gold jewelry components obtained from Morvillo would be sold by B.A.W. to B.A.W.'s customers without B.A.W. having to obtain any permission from Morvillo. (Exhibit C, p. 3).

53. Upon receipt of manufactured gold jewelry components from Morvillo, B.A.W. was free to alter, consume and sell the manufactured gold jewelry components without any restriction.

54. In practice, upon receipt from Morvillo, B.A.W. used those manufactured gold jewelry components without any limitation by Morvillo.

**THE MANNER OF PAYMENTS FROM B.A.W TO MORVILLO**

55. In connection with each purchase of manufactured gold jewelry components from Morvillo, B.A.W. was contractually obligated to compensate Morvillo. The compensation to Morvillo for each transaction had two components.

56. The first component of the compensation to Morvillo related to the amount of pure gold that was contained in the manufactured gold jewelry components Morvillo delivered to B.A.W.

57. Morvillo has represented that, within ten (10) days of receipt of the manufactured gold jewelry components, B.A.W. was supposed to pay to Morvillo an amount of pure gold that was equal to the aggregate amount of pure gold contained in the manufactured gold jewelry components that Morvillo delivered to B.A.W. (Exhibit C, p. 5). So, for example, if B.A.W. received a shipment of manufactured gold jewelry components that contained a total of one kilogram of pure gold, B.A.W. was required to pay to Morvillo one kilogram in weight of pure gold as part of its compensation for the manufactured gold jewelry components.

58. Upon information and belief, B.A.W.'s payments to Morvillo during the Claim Period consisted of pure gold bars or other forms of pure gold that B.A.W. purchased from a third party and arranged for delivery to, or pickup by, Morvillo.

59. B.A.W. also had the option of paying Morvillo in money for the pure gold component of its compensation for the manufactured gold jewelry components. (Exhibit C, p. 5).

60. B.A.W. also had the option of delivering scrap gold to Morvillo. The pure gold content of the scrap gold would then be credited against the amount of pure gold owed to Morvillo. (Exhibit C, p. 4).

61. For Morvillo, it did not "matter what form" the gold was that it received back from B.A.W. The pure gold content of any form of gold payment would be credited to B.A.W.'s account. (Exhibit C, p. 4).

62. The gold that Morvillo expected to receive and did receive as compensation for the manufactured gold jewelry components during the Claim Period was different property than the manufactured gold jewelry components. (Exhibit C, p. 4).

63. The second component to the compensation B.A.W. was to provide to Morvillo was the "labor charge." The labor charge was an amount of money that B.A.W. was to pay Morvillo.

64. The labor charge was intended to be an amount of money that would cover all of Morvillo's expenses and its profit for the manufactured gold jewelry components. (Exhibit C, p. 3). The labor charge was calculated and paid in United States currency.

65. Morvillo has represented that payment terms for the labor charge was thirty (30) days. (Exhibit C, p. 5).

66. The primary purpose of having the purchase price represented in two separate parts was to provide Morvillo with a hedge against the fluctuation in the market price of gold. (Exhibit C, p. 4).

67. In order to manufacture gold jewelry components, Morvillo consumes gold. Gold has been and continues to be volatile in price. By structuring its transactions with B.A.W. so that it was paid in part with an amount of pure gold equal to the amount of pure gold consumed in the manufacture of gold jewelry components delivered to B.A.W., Morvillo intended to minimize its exposure to gold fluctuations and receive gold which could be used by Morvillo in the manufacture of gold jewelry components for future transactions.

68. By having B.A.W. pay it in part with pure gold, Morvillo was transferring the risk of fluctuations in gold price to B.A.W.

## MEASUREMENTS OF GOLD AND PRECIOUS METALS

69. The purity of gold is usually classified by "karat". Pure gold is referred to as "24 karat". Alloys that are not pure gold are classified by ratios of one-twenty-fourth (1/24) of pure. So, for example, an alloy that is fifty percent (50%) gold would be 12 karat (12/24). One of the most common alloys of gold used in jewelry is 14 karat, which is 58.3% gold (14/24).

70. Large quantities of gold and precious metals are measured in kilograms; lesser quantities are measured in "fine troy ounces" (abbreviated as "F.T.O.").

71. Small quantities of gold and precious metals are often measured in units called "pennyweights" (abbreviated as "dwt") or grams. There are 20 pennyweights (20 dwt) in a fine troy ounce (F.T.O.). There are 31.1035 grams in a fine troy ounce (F.T.O.).

## THE SALES OF GOLD FROM MORVILLO TO B.A.W. DURING THE CLAIM PERIOD

**The September 1, 2004 Order – The First Transaction**

72. On or about September 1, 2004, B.A.W. placed an order for a purchase of manufactured gold jewelry components made of 14 karat gold. (A copy of the Order Form is contained within Exhibit D.)

73. In connection with the First Transaction, Morvillo generated a document called a "Packing List." The Packing List specifies that the manufactured gold jewelry components were "sold to" B.A.W. and shipped on September 8, 2004 (Exhibit D). Morvillo has represented that it made this shipment.

74. Morvillo also generated an "Invoice." That Invoice billed B.A.W. 84.3155 fine troy ounces of pure gold and $764.47 as compensation for the manufactured gold jewelry components 'sold to" B.A.W. in this transaction. (Exhibit D).

75. When that invoice was generated by Morvillo, the manufactured gold jewelry components were deducted from Morvillo's inventory records.

76. Upon receipt of the manufactured gold jewelry components in this transaction B.A.W. was free to do whatever it wanted to them without any restriction.

77. Morvillo did not reserve any right, title or interest in the manufactured gold jewelry components delivered to B.A.W. in connection with this transaction. (Exhibit D).

78. Morvillo did not file a Uniform Commercial Code statement for this transaction. (Exhibit C, p. 5).

79. Morvillo did not perfect a security interest in the manufactured gold jewelry components delivered to B.A.W. in this transaction. (Exhibit C, p. 5).

80. Morvillo knew that the manufactured gold jewelry components it delivered to B.A.W. in this transaction would be used by B.A.W. for the manufacturing of jewelry. (Exhibit C, p. 3).

81. Morvillo also knew that the gold jewelry that was made by B.A.W. using the manufactured gold jewelry components obtained from Morvillo in this transaction would be sold by B.A.W. to B.A.W.'s customers without B.A.W. having to obtain any permission from Morvillo. (Exhibit C, p. 3).

82. B.A.W. used the manufactured gold jewelry components from this transaction without any limitation by Morvillo.

83. Both Morvillo (Exhibit C, p. 3) and Morvillo's transactional documents (See the packing List in Exhibit D) explicitly and unequivocally state that Morvillo "sold" to B.A.W. the manufactured gold jewelry components involved in the First Transaction.

84. On or about September 22, 2004, B.A.W. made a payment to Morvillo of 84.30 fine troy ounces of pure gold. According to the representations of Morvillo, this left B.A.W. with a pure gold debt to Morvillo of approximately .0155 F.T.O. (Exhibit D).

**The September 23, 2004 Order -- The Second Transaction**

85. On or about September 23, 2004, B.A.W. sent Morvillo a "Purchase Order" for more 14 karat manufactured gold jewelry components. (A copy of the Purchase Order is contained in Exhibit E).

86. In connection with the Second Transaction, Morvillo generated another "Packing List". The Packing List specifies that Morvillo "sold" 14 karat manufactured gold jewelry components to B.A.W. which were shipped on October 5, 2004. (Exhibit E). Morvillo has represented that it made this shipment.

87. In connection with the Second Transaction, Morvillo also generated an "Invoice." (Exhibit E).

88. The Invoice billed B.A.W. 131.76873 fine troy ounces of pure gold and $1,230 as compensation for the manufactured gold jewelry components. (Exhibit E).

89. When the Invoice was generated by Morvillo, the manufactured gold jewelry components were deducted from Morvillo's inventory records.

90. According to the representations of Morvillo, at the conclusion of the Second Transaction, B.A.W.'s pure gold debt to Morvillo as part of the compensation for the manufactured gold jewelry components was 131.7028 fine troy ounces.

91. Upon receipt of the manufactured gold jewelry components in this transaction, B.A.W. was free to do whatever it wanted to them without any restriction.

92. Morvillo did not reserve any right, title or interest in the manufactured gold jewelry components delivered to B.A.W. in connection with this transaction. (Exhibit E).

93. Morvillo did not file a Uniform Commercial Code statement for this transaction. (Exhibit C, p. 5).

94. Morvillo did not perfect a security interest in the manufactured gold jewelry components delivered to B.A.W. in this transaction. (Exhibit C, p. 5).

95. Morvillo knew that the manufactured gold jewelry components it delivered to B.A.W. in this transaction would be used by B.A.W. for the manufacturing of jewelry. (Exhibit C, p. 3).

96. Morvillo also knew that the gold jewelry that was made by B.A.W. using the manufactured gold jewelry components obtained from Morvillo in this transaction would be sold by B.A.W. to B.A.W.'s customers without B.A.W. having to obtain any permission from Morvillo. (Exhibit C, p. 3).

97. B.A.W. used the manufactured gold jewelry components from this transaction without any limitation by Morvillo.

98. Both Morvillo (Exhibit C, p. 3) and Morvillo's transactional documents (See the Packing List in Exhibit E) explicitly and unequivocally state that Morvillo "sold" to B.A.W. the manufactured gold jewelry components involved in the Second Transaction.

99. On or about October 25, 2004, B.A.W. made a payment to Morvillo of 131.69 fine troy ounces of pure gold. According to the representation of Morvillo, this left B.A.W. with a pure gold debt to Morvillo of approximately .013 F.T.O. (Exhibit E).

**The October 19, 2004 Purchase Order -- The Third Transaction**

100. On or about October 19, 2004, B.A.W. sent Morvillo a "Purchase Order" for additional manufactured gold jewelry components (The Purchase Order is contained in Exhibit F).

101. In connection with the Third Transaction, Morvillo generated a "Packing List." The Packing List specifies that Morvillo "sold" 14 karat manufactured gold jewelry components to B.A.W. that were shipped on October 26, 2004. (Exhibit F). Morvillo has represented that it made this shipment.

102. In connection with the Third Transaction, Morvillo also generated an "Invoice." That invoice billed B.A.W. 195.775 fine troy ounces of pure gold and $1,807.15 as compensation for the manufactured gold jewelry components (Exhibit F).

103. When the Invoice was generated by Morvillo, the manufactured gold jewelry components were deducted from Morvillo's inventory records.

104. According to the representations of Morvillo, at the conclusion of the Third Transaction, B.A.W.'s pure gold debt to Morvillo as part of the compensation for the manufactured gold jewelry components was 195.7788 fine troy ounces.

105. Upon receipt of the manufactured gold jewelry components in this transaction B.A.W. was free to do whatever it wanted with them without any restriction.

106. Morvillo did not reserve any right, title or interest in the manufactured gold jewelry components delivered to B.A.W. in connection with this transaction. (Exhibit F).

107. Morvillo did not file a Uniform Commercial Code statement for this transaction. (Exhibit C, p. 5).

108. Morvillo did not perfect a security interest in the manufactured gold jewelry components delivered to B.A.W. in this transaction. (Exhibit C, p. 5).

109. Morvillo knew that the manufactured gold jewelry components it delivered to B.A.W. in this transaction would be used by B.A.W. for the manufacturing of jewelry. (Exhibit C, p. 3).

110. Morvillo also knew that the gold jewelry that was made by B.A.W. using the manufactured gold jewelry components obtained from Morvillo in this transaction would be sold by B.A.W. to B.A.W.'s customers without B.A.W. having to obtain any permission from Morvillo. (Exhibit C, p. 3).

111. B.A.W. used the manufactured gold jewelry components from this transaction without any limitation by Morvillo.

112. Both Morvillo (Exhibit C, p. 3) and Morvillo's transactional documents (See the Packing List in Exhibit F) explicitly and unequivocally state that Morvillo "sold" to B.A.W. the manufactured gold jewelry components involved in the Third Transaction.

113. On or about November 11, 2004, B.A.W. made a payment to Morvillo of 194.90 fine troy ounces of gold. Upon information and belief, this left a pure gold debt from B.A.W. to Morvillo of approximately .888 F.T.O. (less than an ounce) (Exhibit F).

**The November 8, 2004 Purchase Order -- The Fourth Transaction**

114. On or about November 8, 2004, B.A.W. sent Morvillo a "Purchase Order" for additional 14 karat manufactured gold jewelry components from Morvillo. (A copy of the Purchase Order is contained within Exhibit G).

115. In connection with the Fourth Transaction, Morvillo generated two "Packing Lists." (Exhibit G) The first Packing List specifies that Morvillo "sold"

manufactured gold jewelry components to B.A.W. and shipped them on November 15, 2004. Morvillo has represented that it made this shipment.

116. A second handwritten packing list (Exhibit G) specifies that the balance of the order was shipped to B.A.W. on November 16, 2004. Morvillo has represented that it made this shipment.

117. Morvillo generated two Invoices for the Fourth Transaction (Exhibit G). The first Invoice billed B.A.W. 105.4501 fine troy ounces of pure gold and $988.39 as compensation for the first shipment of manufactured gold jewelry components. The second invoice billed B.A.W. 94.4615 fine troy ounces and $905.41 as compensation for the second shipment of manufactured gold jewelry components.

118. When the two Invoices were generated by Morvillo, the manufactured gold jewelry components were deducted from Morvillo's inventory records.

119. According to the representations of Morvillo, at the conclusion of the Fourth Transaction, B.A.W.'s pure gold debt to Morvillo as part of the compensation for the manufactured gold jewelry components was 202.80 F.T.O.

120. Upon receipt of the manufactured gold jewelry components in this transaction B.A.W. was free to do whatever it wanted with them without any restriction.

121. Morvillo did not reserve any right, title or interest in the manufactured gold jewelry components delivered to B.A.W. in connection with this transaction. (Exhibit G).

122. Morvillo did not file a Uniform Commercial Code statement for this transaction. (Exhibit C, p. 5).

123. Morvillo did not perfect a security interest in the manufactured gold jewelry components delivered to B.A.W. in this transaction. (Exhibit C, p. 5).

124. Morvillo knew that the manufactured gold jewelry components it delivered to B.A.W. in this transaction would be used by B.A.W. for the manufacturing of jewelry. (Exhibit C, p. 3).

125. Morvillo also knew that the gold jewelry that was made by B.A.W. using the manufactured gold jewelry components obtained from Morvillo in this transaction would be sold by B.A.W. to B.A.W.'s customers without B.A.W. having to obtain any permission from Morvillo. (Exhibit C, p. 3).

126. B.A.W. used the manufactured gold jewelry components from this transaction without any limitation by Morvillo.

127. Both Morvillo (Exhibit C, p.3) and Morvillo's transactional documents (See the packing List in Exhibit G) explicitly and unequivocally state that Morvillo "sold" to B.A.W. the manufactured gold jewelry components involved in the Fourth Transaction.

**The November 17, 2004, Purchase Order --The Fifth Transaction**

128. On or about November 17, 2004, B.A.W. sent Morvillo a "Purchase Order" for additional 14 karat manufactured gold jewelry components from Morvillo. (A copy of the Purchase Order is contained within Exhibit H).

129. In connection with the Fifth Transaction, Morvillo generated another "Packing List." (Exhibit H). The Packing List specifies that Morvillo "sold" manufactured gold jewelry components to B.A.W. which were shipped on November 30, 2004. Morvillo has represented that it made this shipment.

130. In connection with the Fifth Transaction, Morvillo also generated an "Invoice." (Exhibit H).

131. The Invoice billed B.A.W. 217.8727 fine troy ounces of pure gold and $2026.13 as compensation for the manufactured gold jewelry components. (Exhibit H).

132. When the Invoice was generated by Morvillo, the manufactured gold jewelry components were deducted from Morvillo's inventory records.

133. According to the representations of Morvillo, at the conclusion of the Fifth Transaction, B.A.W.'s pure gold debt to Morvillo as part of the compensation for the manufactured gold jewelry components was 429.672 F.T.O.

134. Upon receipt of the manufactured gold jewelry components in this transaction B.A.W. was free to do whatever it wanted to them without any restriction.

135. Morvillo did not reserve any right, title or interest in the manufactured gold jewelry components delivered to B.A.W. in connection with this transaction. (Exhibit H).

136. Morvillo did not file a Uniform Commercial Code statement for this transaction. (Exhibit C, p. 5).

137. Morvillo did not perfect a security interest in the manufactured gold jewelry components delivered to B.A.W. in this transaction. (Exhibit C, p. 5).

138. Morvillo knew that the manufactured gold jewelry components that it delivered to B.A.W. in this transaction would be used by B.A.W. for the manufacturing of jewelry. (Exhibit C, p. 3).

139. Morvillo also knew that the gold jewelry that was made by B.A.W. using the manufactured gold jewelry components obtained from Morvillo in this transaction would be sold by B.A.W. to B.A.W.'s customers without B.A.W. having to obtain any permission from Morvillo. (Exhibit C, p. 3).

140. B.A.W. used the manufactured gold jewelry components from this transaction without any limitation by Morvillo.

141. Both Morvillo (Exhibit C, p.3) and Morvillo's transactional documents (See the packing List in Exhibit H) explicitly and unequivocally state that Morvillo "sold" to B.A.W. the manufactured gold jewelry components involved in the Fifth Transaction.

142. On or about December 3, 2004, B.A.W. made a payment to Morvillo of 192.90 fine troy ounces of gold. According to the representations of Morvillo, this left B.A.W. with a pure gold debt to Morvillo of approximately 227.772 fine troy ounces of pure gold as part of the compensation to Morvillo for manufactured gold jewelry components. (Exhibit H).

**The December 13, 2004 Transaction -- The Sixth Transaction**

143. It has been alleged by Morvillo that, on or about December 13, 2004, Morvillo made another shipment of manufactured gold jewelry components to B.A.W. According to the representations of Morvillo, as a result of the December 13, 2004, shipment, B.A.W.'s pure gold debt to Morvillo increased by 231.11 fine troy ounces to an approximate amount of 458.882 fine troy ounces. According to Morvillo, the December 13, 2004, shipment is evidenced, in part, by the document contained within Exhibit I.

144. Upon information and belief a purchase order, a packing ship and an invoice would exist for the Sixth Transaction but those documents have not been produced to Underwriters.

145. When the Invoice was generated by Morvillo, the manufactured gold jewelry components were deducted from Morvillo's inventory records.

146. According to the representations of Morvillo, in addition to the pure gold payment, B.A.W. was obligated to pay the amount of $2,148.32, as part of the compensation for the manufactured gold jewelry components that were shipped to it on December 13, 2004, as part of this Sixth Transaction.

147. Upon receipt of the manufactured gold jewelry components in this transaction B.A.W. was free to do whatever it wanted to them without any restriction.

148. Morvillo did not reserve any right, title or interest in the manufactured gold jewelry components delivered to B.A.W. in connection with this transaction.

149. Morvillo did not file a Uniform Commercial Code statement for this transaction. (Exhibit C, p. 5).

150. Morvillo did not perfect a security interest in the manufactured gold jewelry components delivered to B.A.W. in this transaction. (Exhibit C, p. 5).

151. Morvillo knew that the manufactured gold jewelry components it delivered to B.A.W. in this transaction would be used by B.A.W. for the manufacturing of jewelry. (Exhibit C, p. 3).

152. Morvillo also knew that the gold jewelry that was made by B.A.W. using the manufactured gold jewelry components obtained from Morvillo in this transaction would be sold by B.A.W. to B.A.W.'s customers without B.A.W. having to obtain any permission from Morvillo. (Exhibit C, p. 3).

153. B.A.W. used the manufactured gold jewelry components from this transaction without any limitation by Morvillo.

154. Both Morvillo (Exhibit C, p.3) and, upon information and belief, Morvillo's transactional documents, explicitly and unequivocally state that Morvillo "sold" to B.A.W. the manufactured gold jewelry components involved in the Sixth Transaction.

155. By making the shipment of manufactured gold jewelry components on December 13, 2004, to B.A.W., despite the fact that at that time B.A.W. was already carrying a gold balance in excess of 227 fine troy ounces, Morvillo extended additional credit to B.A.W.

**The December 15, 2004 Purchase Order -- The Seventh Transaction**

156. On or about December 15, 2004, B.A.W. sent Morvillo another "Purchase Order" for additional manufactured gold jewelry components. (A copy of the Purchase Order is contained within Exhibit J).

157. In connection with the Purchase Order, Morvillo generated a "Packing List." The Packing List specifies that Morvillo "sold" 14 karat manufactured gold jewelry components to B.A.W. which were shipped on January 12, 2005. (Exhibit J). Morvillo has represented that it made this shipment.

158. In connection with the January 12, 2004 shipment to B.A.W., Morvillo also generated an "Invoice." (Exhibit J).

159. The Invoice billed B.A.W. 267.243 fine troy ounces of pure gold and $2,481.87 as compensation for the manufactured gold jewelry components delivered to B.A.W. (Exhibit J).

160. When the Invoice was generated by Morvillo, the manufactured gold jewelry components were deducted from Morvillo's inventory records.

161. Upon receipt of the manufactured gold jewelry components in this transaction B.A.W. was free to do whatever it wanted to them without any restriction.

162. Morvillo did not reserve any right, title or interest in the manufactured gold jewelry components delivered to B.A.W. in connection with this transaction. (Exhibit J).

163. Morvillo did not file a Uniform Commercial Code statement for this transaction. (Exhibit C, p. 5).

164. Morvillo did not perfect a security interest in the manufactured gold jewelry components delivered to B.A.W. in this transaction. (Exhibit C, p. 5).

165. Morvillo knew that the manufactured gold jewelry components it delivered to B.A.W. in this transaction would be used by B.A.W. for the manufacturing of jewelry. (Exhibit C, p. 3).

166. Morvillo also knew that the gold jewelry that was made by B.A.W. using the manufactured gold jewelry components obtained from Morvillo in this transaction would be sold by B.A.W. to B.A.W.'s customers without B.A.W. having to obtain any permission from Morvillo. (Exhibit C, p. 3).

167. B.A.W. used the manufactured gold jewelry components from this transaction without any limitation by Morvillo.

168. Both Morvillo (Exhibit C, p.3) and Morvillo's transactional documents (See the Packing List in Exhibit J) explicitly and unequivocally state that Morvillo "sold" to B.A.W. the manufactured gold jewelry components involved in the Seventh Transaction.

169. According to the representations of Morvillo, at the conclusion of the Seventh Transaction, B.A.W.'s pure gold debt to Morvillo as part of the compensation for the manufactured gold jewelry components was 726.125 F.T.O.

170. By making the shipment on January 12, 2005 to B.A.W., despite the fact that B.A.W.'s alleged pure gold debt to Morvillo was already more than 458 fine troy ounces, Morvillo extended B.A.W. additional credit.

171. On or about January 18, 2005, B.A.W. made a payment to Morvillo of 225.05 fine troy ounces of pure gold. According to the representations of Morvillo, this left B.A.W.'s pure gold debt to Morvillo at approximately 501.075 F.T.O. (Exhibit J).

172. It has been alleged by Morvillo that, after the January 18, 2005 payment, there were no further transactions between B.A.W. and Morvillo and no further payments by B.A.W.

**THE CLAIM**

173. In May 2005 Morvillo made the Claim under the Policy. In doing so, Morvillo demanded that Underwriters indemnify it to the extent that B.A.W. had failed to fully pay Morvillo for the manufactured gold jewelry components that Morvillo delivered to B.A.W. during the Claim Period.

174. In response to the Claim, Underwriters conducted an investigation.

175. On or about December 19, 2005, Morvillo executed a proof of loss despite explicit instruction to the contrary by Underwriters. (Exhibit K). That hostile proof of loss was delivered to Underwriters in London by broker Clayton's on December 28, 2005. That proof of loss attributed a value of $217,968 to the unpaid pure gold debt that B.A.W. owed to Morvillo.

176. Subsequent to the delivery of the proof of loss, Underwriters completed their investigation and evaluation of this Claim. In doing so, Underwriters have reached the conclusion and belief that there is no coverage for the Claim under the Policy. Underwriters have notified Morvillo of their position.

177. As a result, there is a dispute between Underwriters and Morvillo regarding their respective rights and obligations under the Policy.

**AS AND FOR THE FIRST CLAIM FOR DECLARATORY RELIEF**

178. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 177 of the complaint as if fully set forth herein.

179. Pursuant to the Policy, Underwriters agreed to provide insurance for the "Assured's Stock" against "All Risks of Physical Loss or Damage." (Exhibit A, p. 1).

180. Subject to its terms and conditions, the Policy provides Morvillo with $15 million of coverage for its stock at the Morvillo premises located at 160 Niantic Avenue, Providence, Rhode Island. (Exhibit A, p. 1).

181. Subject to its terms and conditions, the Policy also provides $150,000 of coverage for Morvillo's stock when it is located at the premises of a third party. As noted above, this coverage is set forth in the language providing $150,000 of coverage "in respect of interest at third Parties…" (Exhibit A, p. 1).

182. The Claim allegedly arose from a series of transactions between Morvillo and B.A.W. during the Claim Period.

183. Each of the claimed deliveries of manufactured gold jewelry components by Morvillo to B.A.W. during the Claim Period was intentional – and, therefore, not fortuitous.

184. Each of the claimed transactions during the Claim Period involved the sale of manufactured gold jewelry components from Morvillo to B.A.W.

185. Upon completion of each of the claimed deliveries by Morvillo to B.A.W., all right, title and interest in the manufactured gold jewelry components passed from Morvillo to B.A.W. As such, Morvillo had no insurable interest in the manufactured gold jewelry components once the deliveries were completed.

186. Once each of the deliveries from Morvillo to B.A.W. was completed, the manufactured gold jewelry components were no longer insured "Stock" but instead became the property of B.A.W.

187. B.A.W. is not an insured under the Policy, has no rights under the Policy and has not made a Claim under the Policy.

188. Property owned by B.A.W. was not insured under the Policy.

189. After the claimed deliveries were completed, Morvillo owned only contractual rights to receive payments from B.A.W. in the form of gold (in any form) and/or money.

190. Any outstanding debt or contractual obligations that B.A.W. may owe to Morvillo do not constitute insured property or "Stock" within the scope and terms of the Policy.

191. Morvillo has claimed at all times that its loss occurred on May 10, 2005. May 10, 2005, was more than three months after all right, title and interest in the last delivery of manufactured gold jewelry components had passed to B.A.W.

192. It was inherent in each transaction during the Claim Period -- and understood by both Morvillo and B.A.W. – that B.A.W. would use the manufactured gold jewelry components that it received from Morvillo to manufacture 14 karat gold jewelry

and that B.A.W. had the right to alienate that gold jewelry it manufactured in whole or in part from the manufactured gold jewelry components that it received from Morvillo.

193. Upon information and belief, B.A.W. used all of the manufactured gold jewelry components to manufacture and complete jewelry which was sold by B.A.W. to its customers before May 10, 2005.

194. Therefore, Underwriters are entitled to a declaratory judgment that there is no coverage for the Claim under the Policy.

**AS AND FOR THE SECOND CLAIM FOR DECLARATORY RELIEF**

195. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 194 of the complaint as if fully set forth herein.

196. There was no physical loss or damage to insured property.

197. Therefore, Underwriters are entitled to a declaratory judgment stating that there is no coverage for the Claim under the Policy.

**AS AND FOR THE THIRD CLAIM FOR DECLARATORY RELIEF**

198. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 197 of the complaint as if fully set forth herein.

199. Morvillo had no insurable interest in the manufactured gold jewelry components after their delivery to B.A.W.

200. Therefore, Underwriters are entitled to a declaratory judgment stating that there is no coverage for the Claim under the Policy.

**AS AND FOR THE FOURTH CLAIM FOR DECLARATORY RELIEF**

201. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 200 of the complaint as if fully set forth herein.

202. There was no fortuitous loss of insured property

203. Therefore, Underwriters are entitled to a declaratory judgment stating that there is no coverage for the Claim under the Policy.

**AS AND FOR THE FIFTH CLAIM FOR DECLARATORY RELIEF**

204. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 203 of the complaint as if fully set forth herein.

205. Upon completion of the claimed deliveries to B.A.W., the manufactured gold components became the property of B.A.W. and were no longer insured under the Policy.

206. Upon completion of the claimed deliveries to B.A.W., Morvillo owned only a contractual obligation from B.A.W. to pay a debt with the payment to be made in the form of gold/and or money at B.A.W.'s option.

207. Any outstanding debt or contractual obligations that B.A.W. may owe to Morvillo do not constitute insured property or "Stock" within the scope and terms of the Policy.

208. Therefore, Underwriters are entitled to a declaratory judgment stating that there was no coverage for the Claim under the Policy.

**WHEREFORE,** Underwriters request and pray that this Court grant to them the following relief for each and every claim set forth herein:

(a) A declaratory judgment stating that there is no coverage for the Claim under the Policy; and

(b) A declaratory judgment stating that Underwriters have no further obligations of any kind to Morvillo with respect to the Claim; and

(c) Such other further relief as the Court deems appropriate.

Dated: Providence, Rhode Island
January 25, 2006

C. Russell Bengtson
C. Russell Bengtson #1233 pab
Carroll, Kelly & Murphy
Counsel for Plaintiffs THOSE INTERESTED UNDERWRITERS AT LLOYD'S, LONDON and WURTTEMBERGISCHE VERSICHERUNGS AG the subscribers to the contract of insurance numbered BB 040010/19
One Turks Head Place, Suite 400
Providence, Rhode Island 02903
Tele. No.: (401) 331-7272
Fax No.: (401) 331-4404

Of Counsel:

Owen B. Carragher, Jr.
Peter J. Rossi
Subject to future *pro hoc vice* application
Lankler & Carragher, LLP
845 Third Avenue
17th Floor
New York, NY 10022
Tel. No.: (212) 812-8910
Fax No.: (212) 812-8920