UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOSE INTERESTED UNDERWRITERS AT LLOYD'S, LONDON and THE WURTTEMBERGISCHE VERSICHERUNGS AG the subscribers to the contract of insurance numbered BB 040010/19 | : | |
| VS. | : | C.A. NO. 06-33T |
| MORVILLO AND SONS, INC.; and LEE'S MANUFACTURING CO., INC. | : | |

## MOTION TO DISMISS

Now come the plaintiffs and move pursuant to FRCP 9(b) and 12(b)(6) to dismiss with prejudice the Second and Fourth Counterclaims of defendant, Morvillo and Sons, Inc. and Lee's Manufacturing Co., Inc.

CARROLL, KELLY & MURPHY

C. RUSSELL BENGTSON #1233
One Turks Head Place, Suite 400
Providence, RI 02903
(401) 331-7272 Telephone
(401) 331-4404 Facsimile

## CERTIFICATION

I hereby certify that a true copy of the within was hand delivered to J. Scott Kilpatrick, Esquire, Chisholm Chisholm & Kilpatrick, One Turks Head Place, Suite 1313, Providence, RI 02903 on the 24th day of April, 2006.

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOSE INTERESTED UNDERWRITERS AT LLOYD'S, LONDON and THE WURTTEMBERGISCHE VERSICHERUNGS AG the subscribers to the contract of insurance numbered BB 040010/19 | : | |
| Plaintiffs, | : | |
| -vs.- | : | CA No: 06-33T |
| MORVILLO AND SONS, INC.; and LEE'S MANUFACTURING CO. INC., | : | |
| Defendant | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS DEFENDANTS' SECOND AND FOURTH COUNTERCLAIMS**

Plaintiffs, THOSE INTERESTED UNDERWRITERS AT LLOYD'S, LONDON and WURTTEMBERGISCHE VERSICHERUNGS AG the subscribers to the contract of insurance numbered BB 040010/19 (henceforth, collectively referred to herein as "Underwriters"), by their attorneys Carol, Kelly & Murphy, respectfully submit this Memorandum of Law in support of their instant motion, pursuant to FRCP 9(b) and 12(b)(6), to dismiss with prejudice the Second and Fourth Counterclaims of Defendant, MORVILLO AND SONS, INC.; and LEE'S MANUFACTURING CO. INC. (henceforth, "Morvillo").

## PRELIMINARY STATEMENT

This action was commenced by Underwriters because they do not agree with defendant Morvillo over whether an insurance claim that was submitted by Morvillo was covered pursuant to the terms of the contract of insurance numbered BB 040010/19 (the "Policy"). At the heart of the disagreement lie a series of transactions between Morvillo and a third party whereby Morvillo delivered manufactured gold jewelry components to the third party and was paid for some but not all of the property delivered. Briefly summarized, Underwriters' view is that the transactions involved the sale of property. Any loss that might have occurred to the property after it was sold was not insured. In addition, any debt or contractual obligation that was owed to Morvillo after the sale of the property was also not insured.

In contrast, despite transactional documents and statements to Underwriters that repeatedly described the property as having been sold to the third party, Morvillo apparently now wishes for the transactions to be viewed as something else: bailments.[1]

After investigating the claim and the nature of the underlying transactions involved in the claim, Underwriters disclaimed coverage and immediately thereafter commenced this action in order to obtain a ruling from this Court as to its rights and obligations under the Policy.

In an attempt to distract the Court and Underwriters from the core issues at hand (i.e. the nature of the transactions and the scope of coverage under the insurance policy),

[1] Morvillo has several ways of describing the transactions (e.g. goods delivered on consignment, goods delivered pursuant to a toll agreement, goods delivered on a toll basis, or goods delivered pursuant to a toll account). However, the essential argument by Morvillo is that somehow it retained some kind of ownership interest in the manufactured gold jewelry parts that it delivered to the third party (knowing those parts would be consumed by the third party in the making of jewelry for the third party's own sales) and a loss occurred when the third party failed to return the manufactured gold jewelry components or make complete payment on same.

Morvillo has alleged counterclaims for fraud, bad faith and estoppel. This motion addresses the fraud and estoppel claims, which Underwriters submit should be dismissed for failure to state a claim upon which relief can be granted. The fraud claim is plead in conclusory fashion in violation of the Federal Rules of Civil Procedure without any of the specificity required, and it also fails to allege all of the required elements of a claim for fraud under Rhode Island law. The claim for estoppel fails for three reasons: (1) a claim for estoppel cannot be used to expand coverage under an insurance policy; (2) Morvillo has not adequately plead the elements for a claim of estoppel; and (3) a claim for estoppel cannot be maintained when there is an express contract between the parties.

Based upon the foregoing, and as set forth more fully below, the Second and Fourth Counterclaims must be dismissed with prejudice.

## STATEMENT OF FACTS

The facts stated herein are based upon the undisputed allegations in the pleadings. The Complaint and the Amended Answer and Counterclaims are attached as exhibits A and B, respectively, to the Affirmation of C. Russell Bengtson, dated April 24, 2006, and submitted in support of Underwriters' Motion to Dismiss the second and fourth counterclaims (the "Bengtson Aff.").

In or about February 2005, Morvillo acted through its brokers and agents -- Basden Risk Management in Birmingham, Alabama (henceforth, BRM") and Dennis M. Clayton & Co. Ltd. in London, England (henceforth, "Clayton's) -- to enter into a contract of insurance in London, England, with Underwriters.[2] In connection with that transaction, representatives of Underwriters affixed their marks (referred to as "scratches") to a contract of insurance in the form of a document entitled "Declaration

[2] Complaint ¶26 admitted in Amended Answer ¶2.

No: BB040010/19" (henceforth, the "Policy").[3] A copy of the Policy was annexed to the Complaint as Exhibit A. See Bengtson Aff. Exhibit A. Pursuant to the Policy, Underwriters agreed to provide insurance for the "Assured's Stock" against "All Risks of Physical Loss or Damage."[4] The Policy was for a term beginning on February 1, 2005, and ending on February 1, 2006.[5] Subject to its terms and conditions, the Policy provided Morvillo with $15 million of coverage for its stock at the Morvillo premises located at 160 Niantic Avenue, Providence, Rhode Island.[6] The Policy also provided $150,000 of coverage for Morvillo's stock when it is located at the premises of a third party. This coverage is set forth in the language providing $150,000 of coverage "in respect of interest at third Parties…" Morvillo claims that a $250,000 peak season increase applies.[7]

Morvillo has submitted an insurance claim (the "Claim") to Underwriters seeking indemnification for what it has alleged was a physical loss of insured property.[8] That claimed loss allegedly arose from a series of seven transactions between Morvillo and an entity named Bangles Around the World (henceforth, "B.A.W.") during the period of September 2004 through January 2005 (the "Claim Period").[9] The essence of Morvillo's claim is that property was sent to B.A.W. and not paid for nor returned. This, they argue gives rise to an insurance claim under the Policy.

Morvillo admits that until B.A.W. ceased operating in or before May 2005, B.A.W. was in the business of manufacturing bangle bracelets and other types of finished

---

[3] Complaint ¶27 admitted in Amended Answer ¶2.
[4] Compare Complaint ¶28 with Amended Answer ¶8.
[5] Complaint ¶29 admitted in Amended Answer ¶2.
[6] Complaint ¶30 admitted in Amended Answer ¶2.
[7] Compare Complaint ¶31 with Amended Answer ¶9.
[8] Complaint ¶13 admitted in Amended Answer ¶2.
[9] Complaint ¶14 admitted in Amended Answer ¶2.

jewelry, predominantly for wholesale distribution.[10] Morvillo supplied B.A.W. with manufactured gold jewelry components necessary for manufacturing the finished jewelry that it sold.[11] None of the transactional documents for the seven transactions during the Claim Period reserved to Morvillo any right, title or interest in the manufactured gold jewelry components that Morvillo delivered to B.A.W. during the Claim Period.[12] Furthermore, Morvillo admits that it never filed any Uniform Commercial Code statements and made no efforts to perfect a security interest for any of the manufactured gold jewelry components delivered to B.A.W. during the Claim Period.[13]

Morvillo knew that the manufactured gold jewelry components that it delivered to B.A.W. in each of the seven transactions during the Claim Period would be used by B.A.W. for the manufacturing of jewelry.[14] Morvillo also knew that the gold jewelry that was made by B.A.W. using the manufactured gold jewelry components obtained from Morvillo would be sold by B.A.W. to B.A.W.'s customers without B.A.W. having to obtain any permission from Morvillo.[15] Upon receipt of manufactured gold jewelry components from Morvillo in each of the seven transactions, B.A.W. was free to alter, consume and sell the manufactured gold jewelry components without any restriction.[16] In practice, upon receipt from Morvillo, B.A.W. used those manufactured gold jewelry components without any limitation by Morvillo.[17]

---

[10] Complaint ¶35 admitted in Amended Answer ¶2
[11] See Complaint ¶36 not denied in Amended Answer, see, e.g. ¶¶ 3, 9 and 10.
[12] See Complaint ¶49 not denied in Amended Answer, see, e.g. ¶¶ 3, 14 and 15; see also transaction documents attached to Complaint as Exhibits D-J.
[13] Complaint ¶50 admitted in Amended Answer ¶2; see infra footnote 24.
[14] Complaint ¶51 admitted in Amended Answer ¶2.
[15] Complaint ¶52 admitted in Amended Answer ¶2.
[16] Complaint ¶53 admitted in Amended Answer ¶2.
[17] See Complaint ¶54 not denied in Amended Answer, see, e.g. ¶¶ 3, 14 -16

The transactional documents for each of the seven transactions during the Claim Period were provided by Morvillo to Underwriters in connection with Underwriters investigation of Morvillo's Claim. Indeed, Morvillo's own documents provided the primary basis for Underwiters conclusion that the transactions were sales (for which Morvillo had not received full payment and therefore did not give rise to a covered loss under the Policy).[18] Underwriters attached all of those documents to the Complaint (as Exhibits D-J), and in paragraphs 72 through 172 described each of the transactions in detail, based almost entirely upon the contents of the documents. Notably, by failing to dispute any of those paragraphs, Morvillo has admitted all of the allegations contained in paragraphs 72 through 172 of the Complaint.[19] A summary of Morvillo's admissions is set forth below.

The transaction documents include Purchase Orders, Packing Lists, and Invoices.[20] Morvillo's Packing Lists specify that the manufactured gold jewelry components were "sold to" B.A.W.[21] In the Invoices, Morvillo billed B.A.W. for the amount of fine troy ounces of pure gold contained in the manufactured gold jewelry components shipped pursuant to each Purchase Order, and also billed a dollar figure as compensation for the manufactured gold jewelry components 'sold to" B.A.W. in each transaction.[22] When each invoice was generated by Morvillo, the manufactured gold

---

[18] As set forth in the Complaint, Underwriters also relied, among other things, upon the statements of Morvillo's comptroller. Attached as Exhibit C to the Complaint is a transcription of a taped interview of Morvillo's comptroller conducted by Underwriters' adjuster as part of the investigation.
[19] As to those paragraphs, and others, Morvillo states in its Answer "Defendants neither admit nor deny the allegations contained therein, and leave Plaintiffs to their proof thereon. See Amended Answer ¶17. When a party fails to deny an allegation in a Complaint it is deemed admitted, and pleading that Defendant will leave Plaintiff to its proof does not constitute a denial. See FRCP Rule 8(b) and (d).
[20] See Exhibits D-J of the Complaint, attached to the Bengtson Aff. as Exhibit A.
[21] See Complaint ¶¶ 73, 86, 101, 115, 129, and 157 which were not denied in the Amended Answer.
[22] See Complaint ¶¶ 74, 88, 102, 117, 131, and 159 which were not denied in the Amended Answer.

jewelry components were deducted from Morvillo's inventory records.[23] Finally, as set forth generally above, for each of the seven transactions Morvillo admits that it did not reserve any right, title or interest in the manufactured gold jewelry components delivered to B.A.W. in connection with each transaction; Morvillo did not file a Uniform Commercial Code statement for any of the transactions; and Morvillo did not perfect a security interest in the manufactured gold jewelry components delivered to B.A.W. in any of the transactions.[24]

Morvillo made its last shipment to B.A.W. on January 12, 2005.[25] On January 18, 2005, Morvillo received its last payment of fine gold[26] from B.A.W.[27] In May 2005, presumably after learning that B.A.W. had gone out of business, Morvillo made the Claim under the Policy. In doing so, Morvillo demanded that Underwriters indemnify it to the extent that B.A.W. had failed to fully pay Morvillo for the manufactured gold jewelry components that Morvillo delivered to B.A.W. during the Claim Period.[28] Morvillo, however, contends that the transactions were bailments and that it suffered a physical loss of goods entrusted to B.A.W. when B.A.W. went out of business.[29]

Morvillo does not dispute the concept that the Policy does not provide coverage for goods sold and not paid for. Instead, Morvillo has tried vigorously in its pleadings to try to walk away from its own statements and from its own transactional documents in order to find a way of describing the transactions so that they are not sales. Morvillo's

---

[23] See Complaint ¶¶ 75, 89, 103, 118, 132, 145, 160 which were not denied in the Amended Answer.
[24] See Complaint ¶¶ 77, 78, 79, 92, 93, 94, 106, 107, 108, 121, 122, 123, 135, 136, 137, 148, 149, 150, 162, 163, and 164 which were not denied in the Amended Answer.
[25] Amended Answer ¶¶ 43 and 44.
[26] As noted above, after each delivery of manufactured gold jewelry components Morvillo invoiced B.A.W. for the amount of pure gold contained in those gold jewelry parts (which was recorded in the "toll account" and also billed a monetary figure calculated in U.S. Currency.
[27] See Complaint ¶¶ 171 and 172, which were not denied in the Amended Answer.
[28] See Complaint ¶173 which is not denied in the Answer.
[29] See Answer ¶¶ 5 and 6; See Counterclaims ¶¶ 38 and 47.

attempt to hide the true nature of its transactions is perhaps best evidenced in the following quote, which responded to allegations in the Complaint that Morvillo's Comptroller stated that the manufactured gold jewelry components were "sold" to B.A.W.:

> "the term 'sold' could be misleading, as it is used in a casual business context by people in the industry and is being applied in a strict sense for the purposes of a coverage dispute in the context of this claim and resulting litigation. Morvillo admits that it provided gold to BAW in strip for manufacturing. Morvillo denies that it 'sold' gold to BAW."[30]

Morvillo is attempting to turn this coverage dispute in a fraud claim in order to distract from the fundamental question of what happened to the manufactured gold jewelry components. For the reasons set forth below, the Court should not indulge Morvillo's attempt to expand the nature of this coverage dispute, which largely rests upon a determination of the discrete issue: whether or not the transactions between Morvillo and B.A.W. were sales or bailments. Therefore, Underwriters respectfully submit that Morvillo's Second and Fourth Counterclaims should be denied.

## ARGUMENT

In order to survive a motion to dismiss, Morvillo was required to plead facts, which when taken as true, justify the recovery sought. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir. 1996). In assessing the pleadings of a non-movant in a motion to dismiss, the Court is generally obliged to accept as true all well pleaded factual allegations and to draw all reasonable inferences in the non-movants' favor. *See Id.* However, the deferential standard does not compel the Court to "swallow the plaintiff's invective hook, line, and sinker; bald assertions, unsupportable conclusions, periphrastic

[30] Answer ¶12.

circumlocutions, and the like need not be credited." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996); *Campagna v. Massachusetts Dept. of Environmental Protection*, 334 F.3d 150, 155 (1st Cir. 2003)(same). As set forth below, in pleading its counterclaims for fraud and estoppel, Morvillo has failed to allege facts that, even if taken as true, would justify recovery. *See Campagna*, 334 F.3d at 155 ("A plaintiff must allege facts in support of 'each material element necessary to sustain recovery …"); *Doyle*, 103 F.3d at 190 (same).

**POINT I**

**MORVILLO'S SECOND COUNTERCLAIM FAILS TO PLEAD A CLAIM FOR FRAUD IN THE INDUCEMENT**

**A. Morvillo Has Failed To Plead All Of The Necessary Elements Of A Cause Of Action For Fraud In The Inducement**

The essential elements of a cause of action for fraud in Rhode Island are the following: (i) the making of a false representation of fact; (ii) the wrongful intent of the defendant at the time of making the false representation to induce reliance thereon; (iii) the justifiable reliance on the false representation; and (iv) damages sustained as a proximate result of the fraud. *See Guzman v. Jan-Pro Cleaning Systems, Inc.*, 839 A.2d 504, 507 (R.I. 2003); *Women's Development Corp. v. City of Central Falls*, 764 A.2d 151, 160 (R.I. 2001).

"In order to survive a motion to dismiss, plaintiffs must set forth 'factual allegations, either direct of inferential, regarding each material element necessary to sustain recovery." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir. 1996).

Morvillo does not set forth factual allegations regarding each element of a claim of fraud. Nowhere does Morvillo make allegations demonstrating that the purported

representations by Underwriters were false or that when Underwriters allegedly made the representations, that Underwriters had the intent to defraud Morvillo. A reading of paragraphs 52 and 53 of Morvillo's Amended Answer and Counterclaims, clearly demonstrates that Morvillo is not claiming that Underwriters made false representations to induce Morvillo into the contract, but instead is alleging that despite having made promises regarding coverage, Underwriters subsequently took a different position in connection with the particular facts of this instant matter:

> "52. The Underwriters' primary reason for declining coverage was the Underwriters claim that when Morvillo delivered the metal on a toll basis to BAW, title to said metal transferred to BAW and, therefore, the goods were no longer Morvillo's metal and were not covered under the Policy.
>
> 53. The Underwriters took this position knowing full well that on numerous occasions they had previously acknowledged coverage for the identical type of loss under the identical type of coverage, and despite the fact that they had previously acknowledged that goods delivered on a toll basis remained the goods of the party that issued the goods, and despite the representations by the Underwriters' prior practice that clearly indicated to Morvillo that such a Loss was covered under the Policy."

As stated above, in the absence of any factual allegations that Underwriters made false representations, there can be no claim for fraud. *See Supra.* To the extent that paragraph 53 constitutes a vague summary of the allegedly relevant representations of Underwriters, there is no allegation that any of them were false when they were allegedly made. Morvillo does not state that when Underwriters allegedly made the representations vaguely referred to in paragraph 53 about coverage, that Underwriters actually held a different view. Instead, Morvillo seems to offer the factual allegations set forth in paragraph 53 as being the position that Underwriters allegedly actually had at the time the respresentations were allegedly made. In that case, Underwriters would not have been making false representations at the time the undescribed representations in paragraph 53

were allegedly made. Fraud requires something different than a vague allegation that Underwriters are taking a position now that is allegedly inconsistent with a position that they have previously taken.

As set forth above, fraud requires that the defendant knowingly makes a false representation with the intent to induce certain behavior by the plaintiff. *See Guzman*, 839 A.2d at 507. Morvillo has only alleged that in its view, Underwriters current position is inconsistent with what Morvillo claims was its old position. They do not claim that Underwriters ever represented that it held one position, while actually holding another. Thus, they do not allege false representations.

Notably, the primary dispute between Morvillo and Underwriters involves the nature of the claimed loss rather than the type of coverage provided in the Policy. Therefore, it is questionable whether the alleged representations are even relevant. The manner in which Morvillo describes the alleged fraud is a bit misleading. A close review of the pleadings reveals that Morvillo and Underwriters appear to share the view that the relevant policy provision does not provide Morvillo with coverage if it sells goods to a third party and is not paid for those goods.[31]

Underwriters agree in principle with the proposition that under certain circumstances, the Policy provides coverage for the "stock" of Morvillo that it entrusted

[31] Morvillo states that "[t]he Policy specifically provided coverage for losses to Morvillo's interests at third party locations." See Morvillo's Counterclaims at ¶13. Morvillo also states that it "understood that it had an insurable interest in its metals provided to customers on the above described toll basis, under Policy with Defendants. See Id. at ¶ 17. Morvillo states that the transactions were consignments. See Morvillo's Answer at ¶5. Finally, Morvillo states that it "retained an ownership/property interest in the metal provided." Based upon the foregoing, it seems evident that Morvillo's position that its Claim should be covered is based solely on the legal argument that its transactions with BAW were consignments (a type of bailment) and not sales. Indeed, there is no allegation that if the transactions were sales the Policy would apply. Notwithstanding the presence of an Estoppel claim, which should be dismissed for reasons set forth the below, Morvillo does not even allege that Underwriters had provided the Policy under the assumption that the goods were being sold and not consigned. On the contrary, Morvillo states that Underwriters "understood that Morvillo had an insurable interest in its metals provided to customers on the above-described toll basis." See Morvillo's Counterclaims at ¶18.

(i.e. bailed) to a third party. Morvillo disingenuously implies that Underwriters have denied coverage on the basis that it is now taking the position that a physical loss or damage to property bailed to a third party would not be covered, when in fact Morvillo knows that Underwriters dispute the fundamental premise that any goods were bailed to BAW in connection with the seven transactions during the Claim Period. As set forth above, Underwriters investigation of the Claim has lead underwriters to reach the conclusion that the transactions at issue in this case did not constitute bailments but were sales for which Morvillo did not get paid. Therefore, it is a red herring to suggest that any representations regarding the fact that the policy covers goods bailed to a third party could support a fraud claim, or would even be relevant.

In addition, Morvillo's allegations that it was induced by the payment of the 2002 Claim cannot support its fraud claim. As a general matter, it is a novel concept indeed to somehow suggest that the payment of a claim could constitute fraudulent conduct. It is even more ridiculous to suggest that a claim was paid in 2002 as part of a fraud to deny a claim that nobody know would be made in 2005. It is even more difficult to connect the dots to this alleged 2005 fraud, when one considers Morvillo's acknowledgments that the previously paid claim was made on a different policy, which contained undisclosed distinctions from the current Policy, and which was subscribed to by a different combination of Underwriters. See Morvillo's Counterclaims at ¶27.

Even if the payment of the 2002 Claim could somehow be considered fraudlent conduct, as a matter of law Morvillo may not claim that it relied upon the 2002 Claim as an inducement into renewing its insurance contract. Morvillo alleges that it was induced to renew the Policy by the Underwriters "conduct in paying the 2002 Claim." Morvillo's

Counterclaim ¶59. However, Morvillo stopped renewing its insurance with the underwriters who subscribed to the 2002 Policy. The 2002 Policy was, according to Morvillo, a different Policy with a different set of Underwriters (with some overlap of the current subscribers). See Morvillo's Counterclaims at ¶27. Therefore, contrary to its assertion that it was induced to renew the "Policy" by the payment of 2002 Claim, Morvillo did not renew that Policy and therefore cannot now claim that it relied upon the 2002 payment as an inducement to entering into the Policy at issue in this case, which is a different Policy with a different combination of Underwriters. See *Zarella v. Minnestota Mutual Life Insurance*, 824 A.2d 1249, 1258 (R.I. 2003)(holding that a plaintiff could not prevail on a misrepresentation claim, where the plaintiff argued that it had been induced by representations made by its insurer, which were designed to keep the plaintiff as an insured, even though the plaintiff switched to different insurers after the representations were made).

Like the plaintiff in *Zarrella*, at some point after the 2002 claim was paid Morvillo apparently switched to a different policy subscribed to by a different combination of insurers. See Morvillo's Counterclaims at ¶27. Therefore, to the extent that Morvillo is alleging that the 2002 Claim was paid, by the underwriters who subscribed to that previous policy, as a way of inducing Morvillo to continue to insure its business with those underwriters under that policy, it was unsuccessful. Morvillo cannot claim to have relied upon or been induced by the 2002 Claim, with respect to that previous policy and the previous combination of underwriters, and it certainly cannot claim to have been relying on the 2002 claim when it entered into the 2005 Policy at issue in this case.

Even if the Court accepts Morvillo's pleading as true, Morvillo has not set forth factual allegations regarding each element of a claim of fraud. The alleged representations are not claimed to be (nor would they appear to be) false or even material, especially given the fact that the dispute is primarily about the nature of the claimed loss and not whether there is potential coverage for "stock" bailed to third parties. As set forth above, by their own admission Morvillo did not rely on the representations implicit in the past claims practices. Furthermore, in the absence of any allegation that Underwriters had a fraudulent intent to induce Morvillo into entering the Policy at the time it allegedly made the alleged representations, a cause of action for fraud has not been plead. "In order to survive a motion to dismiss, plaintiffs must set forth 'factual allegations, either direct of inferential, regarding each material element necessary to sustain recovery." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir. 1996). Morvillo has not met its pleading burden.

**B. The Allegations In The Fraud Counterclaim Have Not Been Plead With Sufficient Detail And Specificity And Should Be Dismissed**

In addition to failing to allege all of the necessary elements of fraud, the allegations that are made are vague and conclusory, and lack the sufficient detail and specificity required by the Federal Rules of Civil Procedure Rule 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

After reviewing Morvillo's pleading, neither the Court nor Underwriters should be expected to guess as to the circumstances surrounding the alleged representations. Morvillo fails to identify in any meaningful way what was the content of the

representations that it now complains of. Instead, it offers only vague and conclusory allegations that Underwiters made representations that led Morvillo to believe that this claim would be covered. Morvillo is silent regarding when the relevant representations were allegedly made. Morvillo also never states who on behalf of Underwriters made the alleged representations. How are Underwriters supposed to know if the person who made the alleged representations could speak on behalf of Underwriters, or if they were actually made by one of the agents working on behalf of the insured? Morvillo does not allege to whom at Morvillo the alleged representations were made, or when the alleged representations were made. There are no allegations regarding where the alleged representations took place or whether the representations were made in writing, in person, over the telephone, or in some other manner. The rule requires allegations of time, place, and content of the alleged false representations. *See Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991).

The single instance in which Morvillo provides some information regarding the source of the representation is in paragraph 25:

> "The annual Policy together with the annual Application constituted representations by the Underwriters to Morvillo that the Policy provided coverage to Morvillo for goods delivered on a toll basis to customers of Morvillo at the customers' locations."

However, this allegation is in direct contradiction to the Policy, which is annexed to Underwriters' complaint as Exhibit A, and which does not contain any language that could be construed as such a representation. Therefore, the Court should not accept this allegation as true. "When a complaint annexes and incorporates by reference a written instrument, any inconsistencies between the complaint and the instrument must be resolved in favor of the latter." *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 18 (1st Cir.

2002). Moreover, to the extent that Morvillo alleges that the "application" contains representations by Underwriters, Morvillo fails to articulate how the application submitted by Unit to Underwriters constitutes a representation by Underwriters. Morvillo did not attach a copy of the application that it submitted to Underwriters and did not identify exactly what on the application (which was filled out by Morvillo on a form created by its broker, not Underwriters) could conceiveably constitute representations by Underwriters.

The obvious pleading failures by Morvillo underscore the fact that this is an attempt by Morvillo to try to spin a fraud claim out of what is, at most, a contract dispute. Indeed, when the main allegation of a representation is said to be in the contract itself, the fraud claim is duplicative of the breach of contract claim and should be dismissed. In essence, Morvillo is claiming that Underwriters promised certain coverage in the Policy (and in the application) and is now denying that coverage. That is a breach of contract claim and not a fraud claim.

Finally, dismissal is appropriate pursuant to FRCP Rule 9(b) in order to prevent Morvillo from using the vaguely and inadequately plead fraud claim as a basis for launching a costly and time consuming fishing expedition during the discovery phase of this case. In its allegations of fraud Morvillo makes vague references to Underwriters (without saying which Underwriters) paying "similar claims under similar policies" (but implicitly with different insureds) [see Morvillo's Couterclaim at ¶59], as well as allegations that under a different policy, which was only subscribed to by some but not all of the same Underwriters (none of whom are specifically named) Morvillo had a claim that was paid. The Court should not contenance the use by Morvillo of this vague fraud

claim and its accompanying vague allegations as a justification for far reaching discovery demands, which could involve obtaining documents and/or testimony from numerous non-parties located outside of this country. "Rule 9(b) will have failed in its purpose if conclusory generalizations such as these will permit a plaintiff to set off on a long and expensive discovery process in the hope of uncovering some sort of wrongdoing or of obtaining a substantial settlement." *Decker v. Massey-Ferguson, Limited*, 681 F.2d 111, 116 (2nd cir. 1982); see also *Wayne Investments, Inc. v. Gulf Oil Corp.*, 739 F.2d 11, 13-14 (1st Cir. 1984)("Rule 9 'operates to diminish the possibility that a plaintiff with a largely groundless claim will be able to simply take up the time of a number of other people by extensive discovery, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence …' [citations omitted]"); *Haft v. Eastland Financial Corp.*, 755 S.Supp. 1123, 1127 (D.R.I. 1991)(recognizing that one purpose of Rule 9(b) is to "preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'" and noting that in the First Circuit the definition of a strike suit includes "…largely groundless suits brought to increase the settlement value of the case").

Here, this concern is particularly troubling since the pleadings make it absolutely clear that the dispute between these parties is almost entirely based upon the nature of the transactions Morvillo engaged in with BAW, and all of the documents pertaining to those transactions were provided to Underwriters during its investigation (at least as far as has been represented to Underwriters), and they have all been attached to Underwriters Complaint.

**POINT II**

**MORVILLO'S FOURTH COUNTERCLAIM FAILS TO PLEAD A CLAIM FOR ESTOPPEL UPON WHICH RELIEF CAN BE GRANTED**

Morvillo tacks on a claim at the end of its papers alleging, in the most cursory fashion, that Underwriters are "liable to Morvillo and Lee's on theories of Reliance and Estoppel." For the reasons set forth below, this claim must be dismissed.

In *Zarrella v. Minnestota Mutual Life Insurance*, the Supreme Court of Rhode Island describes the elements of a claim for estoppel in the insurance context, as follows:

> "'In the context of insurance coverage the insured must show '(1) that he was misled by the acts or statements of the insurer or its agent; (2) reliance by the insured on those representations; (3) that such reliance was reasonable; and (4) detriment or prejudice suffered by the insured based on the reliance.' [citation omitted]

824 A.2d 1249, 1260 (R.I. 2003).

However, the *Zarrella* Court explained that there are two important limitations on the availability of estoppel claims, which mandate mandate dismissal of Morvillo's estoppel claim. *Zarrella* states the following two limitations:

> "[1] The court, however, may not invoke the doctrine of equitable estoppel to expand the scope of coverage of an insurance policy. [and]
>
> [2] quasi-contractual remedies such as equitable estoppel are inapplicable when the parties are bound by an express contract."

Id. at 1260.

**A. Morvillo's Estoppel Claim Must Be Dismissed Because A Claim For Estoppel Cannot Be Used To Expand The Scope Of Coverage Of An Insurance Policy**

In raising an estoppel claim Morvillo is asserting that Underwriters are estopped from denying coverage in this case. It is undisputed that Underwriters denied Morvillo's Claim fundamentally on the basis that the claimed loss arose

after Morvillo sold property for which it was not fully paid, and any loss that might have occurred after the property was sold is not covered by the Policy.[32] Moreover, it is not alleged by Morvillo that the Policy provides coverage for an unpaid debt. See ¶¶ 12-26 of Morvillo's Counterclaim, describing the "Policy of Insurance." Therefore, by seeking to make Underwriters liable under a theory of estoppel, Morvillo is seeking to expand the coverage in the Policy to include coverage for an unpaid debt or unsatisfied contractual obligations. It is well settled that an estoppel claim cannot be so used. See *Zarrella*, 824 A.2d at 1260 ("The court, however, may not invoke the doctrine of equitable estoppel to expand the scope of coverage of an insurance policy"); *D'Antuono v. Narragansett Bay Ins. Co.*, 721 A.2d 834, 836 -837 (R.I. 1998)(same) citing *Martinelli v. Travelers Insurance Companies,* 687 A.2d 443, 447 (R.I.1996)("Because the Travelers policy *provided no coverage for the claim in question,* the doctrine of estoppel did not bar the insurer from asserting that defense against coverage of the loss").

In *Martinelli*, plaintiff made a claim for uninsured motorist benefits under a policy that was issued to a company in which the plaintiff was an employee and the principal shareholder. *Id.* at 444. The claim was denied on the basis that the coverage was not available for the plaintiff, who was not an insured under the policy. *Id.* at 445-446. Plaintiff argued that Travelers should be estopped from denying the claim because Travelers had previously paid uninsured-motorist benefits to his father's estate under the same policy, which had since been renewed (plaintiff's father was the principal

---

[32] Morvillo alleged that, "The Underwriters' primary reason for declining coverage was the Underwriters claim that when Morvillo delivered the metal on a toll basis to BAW, title to said metal transferred to BAW and, therefore, the goods were no longer Morvillo's metal and were not covered under the Policy." ¶ 52.

shareholder of the insured when he was killed in a car accident). *Id.* at 447. Travelers alleged that the uninsured-motorist payments were mistakenly paid to the father's estate, and further contended that estoppel could not be used to expand coverage. Id. The Court agreed. Id. "Because the Travelers policy provided no coverage for the claim in question, the doctrine of estoppel did not bar the insurer from asserting that defense against coverage of the loss." Id.

The rule that does not allow an insured to use an estoppel claim to expand the coverage under an insurance policy has an important public policy component: the rule encourages the payment of claims by eliminating the potentially chilling effect on an insurer of having previously paid claims used against it by insureds raising subsequent uncovered claims. As the Court in *Martinelli* points out, there are any number of reasons, including mistake, why a questionable claim might be paid. Inviting estoppel claims by insureds to prevent insurers from denying uncovered claims on the basis that they might have paid a similar claim in the past, will only lead to fewer claims being paid and/or longer and more costly investigations, which would not benefit insureds or the public in general.

Therefore, the claim for estoppel should be dismissed because the legal premise upon which it is based is fatally flawed, as the recovery sought is not permitted as a matter the law.

### B. Morvillo's Estoppel Claim Must Be Dismissed Because A Claim For Estoppel Is Inapplicable Where The Parties Are Bound By An Express Contract

In 2003, the Supreme Court of Rhode Island held that a claim for estoppel could not be applied in a case in which the parties were already bound by an express contract. *Zarrella v. Minnestota Mutual Life Insurance*, 824 A.2d 1249, 1260 (R.I. 2003):

> "Additionally, quasi-contractual remedies such as equitable estoppel are inapplicable when the parties are bound by an express contract. [citations omitted]. In this case, the trial justice held that the doctrine of equitable estoppel did not apply because plaintiff and defendant had an express, unambiguous insurance contract. Because the doctrine of equitable estoppel shall not apply to unambiguous contracts or to enlarge the scope of insurance benefits, there are no set of facts under which plaintiff could prevail on this theory"

Here, there is no allegation by Morvillo that the terms of the contract are ambiguous. Indeed, as set forth above, there does not seem to be any dispute regarding the proposition that the coverage of Morvillo's interests at third party locations required that Morvillo had to retain an insurable interest in its goods at third party locations, and/or some kind or ownership or property interest.[33] There is also no allegation that the Policy could be interpreted to mean that Morvillo had obtained insurance for goods that it sold but was not paid for. Therefore, based upon the undisputed facts represented by the pleadings, the Policy represents an unambiguous express contract of insurance, against which the equitable theory of estoppel may not be applied. *Id.*

### C. Morvillo Does Not Allege The elements Of A Claim For Estoppel

In order to state a claim for estoppel Morvillo must allege that: (1) it was misled by the acts or statements of its insurer; (2) that it relied on those representations; (3) that such reliance was reasonable; and (4) it suffered some

---

[33] See Morvillo's Conuterclaims at ¶¶ 13, 17, 20, 38, 47.

detriment or prejudice based on the reliance. *See Zarrella*, 824 A.2d at 1260 (R.I. 2003). Morvillo has failed to allege each element.

In support of its estoppel claim, Morvillo alleges that in 2002 a claim was paid on a previous Lloyds policy, which was subscribed to by some, but not all of the Underwriters involved in this case. See Morvillo's Counterclaim at ¶ 27. In the absence of an allegation that all of the current Underwriters subscribed to the Policy at issue who made the decision to pay the 2002 claim, Morvillo has failed to allege the first element of the claim. *See, e.g., East Greenwich Yacht Club v. Coastal Res. Mgmt. Council*, 118 R.I. 559, 568, 376 A.2d 682, 686 (1977) (holding a city was not estopped from seeking judicial review of the defendant's approval of a construction project even though the city's zoning review board had granted an exception, since the court was "not persuaded that . . . such an identity of interests exists between the city and its agency that the approval by the latter implies approval by the former"). It would be hard to imagine the Supreme Court of Rhode Island allowing the estoppel of the Underwriter's coverage decision in this case based on the previous conduct of a different group of Underwriters (albeit with an undetermined number of Underwriters in common) when in the previously cited case, the Court would not allow a city to be estopped from seeking judicial review of a decision that its own agency approved.

Even if Morvillo did allege that its current insurers were responsible for the decision to pay the 2002 claim, it is not enough to support the claim for estoppel, because Morvillo's complaint is completely devoid of any allegations that Underwriters

intentionally induced it to rely on its decision to pay the 2002 claim. *See Martinelli v. Travelers Insurance Companies*, 687 A.2d 443, 446-447 (R.I. 1996):

> "In order to argue a claim of estoppel successfully, plaintiff must show that defendant, by some affirmative conduct or representation, intentionally induced plaintiff to act or to fail to act in detrimental reliance on that conduct or representation. [citation omitted] **'The key element of an estoppel is intentionally induced prejudicial reliance.'** [citation omitted]. The record revealed no evidence that Travelers, by word or deed, intentionally induced the plaintiff's reliance. Instead, **we conclude that Travelers could have paid the claim to Martinelli's estate for any number of reasons, including mistake**. Therefore, the plaintiff's claim lacked an essential element of estoppel." (emphasis added)

*Martinelli*, 687 A.2d at 447. Accordingly, as the Supreme Court of Rhode Island in *Martinelli* identified "intentionally induced prejudicial reliance" as the "key element" of an estoppel claim, the absence in the case at bar of any such allegations in Morvillo's complaint leaves Morvillo critically lacking an "essential element" of its estoppel theory. *Id. See also Leiter v. Allstate Ins. Co.*, 725 A.2d 882, 883 (R.I. 1999) (denying plaintiff's claim to estop insurer from denying coverage in part because the plaintiff "failed to present any evidence that defendant intentionally misled her regarding the existence of . . . . coverage"); *D'Antuono v. Narragansett Bay Ins. Co.*, 721 A.2d 834, 837 (R.I. 1998) (same).

For all of the foregoing reasons, Morvillo's claim for equitable estoppel must be dismissed.

**WHEREFORE,** Plaintiffs move this Court to enter an order dismissing the Second and Fourth Counterclaims contained in the Amended Answer and Counterclaims; and for whatever other relief the Court deems just and proper.

Dated: Providence, Rhode Island
April 24, 2006

C. Russell Bengtson (#33
Carroll, Kelly & Murphy
Counsel for Plaintiffs THOSE INTERESTED UNDERWRITERS AT LLOYD'S, LONDON and WURTTEMBERGISCHE VERSICHERUNGS AG the subscribers to the contract of insurance numbered BB 040010/19
One Turks Head Place, Suite 400
Providence, Rhode Island 02903
Tele. No.: (401) 331-7272
Fax No.: (401) 331-4404

Owen B. Carragher, Jr.
Peter J. Rossi
Lankler & Carragher, LLP
845 Third Avenue
17th Floor
New York, NY 10022
Tel. No.: (212) 812-8910
Fax No.: (212) 812-8920

Applications for admission *pro hac vice* for Owen B. Carragher, Jr. and Peter J. Rossi are pending before the Court.

**CERTIFICATION**

I hereby certify that a true copy of the within was hand delivered to J. Scott Kilpatrick, Esquire, Chisholm Chisholm & Kilpatrick, One Turks Head Place, Suite 1313, Providence, RI 02903 on the 24th day of April, 2006.

______________________________